Chief Justice Bibb
delivered the Opinion of the Court.
In 1817, the heirs of Edward Mills exhibited their bill against Lee and Graham, setting forth; — that their ancestor was possessed of a tract of land in Mason county, of 2,000 acres, granted to him by patent, in 1790; — that Arthur Fox’s claim of 20,000 conflicted; that by an agreement between their ancestor and Fox, of 1793, the claim of their ancestor was reduced to-acres; — that Henry Lee and Richard Graham asserted claim to this tract, under an entry of 20,000 acres, in the name of Edward Graham: shewed their ancestor the entry, a decree for the title against the heirs of Edward Graham; a patent for the same to the heirs of Richard Graham deceased, under whom they alleged they derived title, when in fact and in truth,— “the warrants on which said entry was made, were withdrawn and assigned to other persons, in whose-names they had been entered elsewhere, and, — no legal survey had ever been made on said land, a certam John Waller having made the survey and returned the plat and certificate thereof, on the -day of-in the year-pretending to-act as deputy for Thomas Marshall, surveyor of Fayette county, who had been then dead a number.of years;, on which pretended and illegal survey- and return, a patent had been, illegally and fraudu--lently procured, younger in date than that under-which your .complainant’s ancestor held title; — that, said defendants well knowing the premises, fraudulently concealed the same from the ancestor; — and-represented their claim to be a good and valid, claim, and the survey thereon, and the registry of the plat and certificate and emanation of the grant, to have been strictly legal; — and.said Edward Mills-well knowing at the time, that the entry under-which he held was invalid, and believing and confiding in the representations of the defendants, that, their claim, was superior; — he conveyed them, his- *92 land on the 1st day of May, 1810, for no other or farther consideration than a payment for the lasting and valuable improvements made thereon; — that their ancestor in his life time, discovered the fraud and applied to them to rescind the contract, which they refused, but made him the proposals signed by the defendants and marked A, which shows that nothing was paid their ancestor for the land, and the value of improvements alone, were taken, into Consideration.”
Writing cont¡lining the terms of the mSioftíw controversy ' to arbitra-■101,:
Answer of Lee and Gra-
This paper A, is in form of an agreement, drawn and signed by the defendants, but never signed^ by the ancestor or any one on his behalf, proposing, that the compromise between Mills and Fox, and between Mills and Graham and Lee, shall be submitted to men learned in the law, to, he chosen by the parties, to say whether under all the circumstances relative to both compromises, said Lee acting on behalf of Fox’s heirs and Graham, ought to give up Fox’s bond to Mills, which Mills had surrendered under the second compromise between Mills and Lee and Graham; if so, then that Mills shall receive one dollar per acre for all the land held by Mills under said agreement, except fifty acres sold by-Mills to Jqnes, twenty acres sold by him to Gates and sixty acres sold by him to M’Michael; provided however, that if Lee’s and Graham’s claim is established, the whole of this agreement to be void; this proposition submitted by Lee and Graham and signed by them, with a view that Mills should sign it, bears date in September, 1810.
The prayer of the bill is to rescind the agreement between Mills, Lee and Graham, and have the land reconveyed to the heirs of Mills.
The answers, set forth, that the compromise complained o.f, was of a suit then actually brought and pending between Lee and Graham as complainants under the entry of Edward Graham, for 20,000, upon a survey executed by John Waller, in 1784, for 14,850 acre.s, part of the entry of 20,000 acres, and patent thereon, that Waller was, when he executed the survey, a lawful authorized deputy qf Thonias Marshall, tlien surveyor of J?ayette, the *93 land then lying in Fayette; that the survey was recorded in Fayette, by the successor of Thomas Marshall, and the patent obtained thereon by the trustees of Richard Graham deceased, in virtue of a decree in chancery, all of which they believe to have been fairly and legally done.
They set forth the agreement of 1809, between Mills and the defendants in this suit, and exhibit the agreement, and the deed afterwards made to them by Mills, in pursuance of that agreement, dated in 1810, by which it appears; — that the compromise was of a suit then pending on the adversary conflicting claims; — it recites that Mills, “after a full investigation of the aforesaid claims, being of opinion that the said Edward Mills’ claim cannot be sustained against the said Lee and Graham,” agrees to convey by quit-claim, to Lee and Graham, the aforesaid survey of 2,000 acres; — Lee and Graham to pay Mills for all improvements, by himself or £hose claiming under him, agreeable to the occupying claimant law; — Mills to retain 75 acres sold,* to Smally and Gatesj sixty acres sold to the widow M’Michael, at valuation, to be deducted out of the valuation of improvements.
In May, 1810, Mills conveyed to Lee aiid Graham, the tract of 2,000 acres, by a quit-claim deed, with a special provision that if the land should be taken by any other claim, Lee and Graham shall bear the loss, without any compensation therefor from Mills;
They admit that there was a marginal note to the entry in the surveyor’s office, signifying “withdrawn,” but that upon search no entry withdrawing it can be found; and assert that Mills was apprized of that.
They deny that the warrants upon which Graham’s entry was founded, were properly or legally withdrawn from the office.
They say there were these considerations to the agreement of compromise: the dismissal of the suit then pending, which has been accordingly done, at tliqir co^ts; the paying for improvements, which *94 has been done, and the relinquishment of their claim to the persons holding under Mills named in the agreement, which lias also been done.
Decree of the circuit court, dismissing the bill.
Case stated iiom the pleadings, exhibits and proofs.
Grounds stated in the bill.
They deny all the fraud wherewith they are charged, and insist, that the terms in paper A, exhibited by complainant but rejected by him, were offered on their part, not on an application by Mills to rescind the compromise, but on an application by him to them to pay one dollar per acre for his claim, which he said he had been offered by another, and deny that Mills ever desired or offered to rescind, but wanted a dollar per acre, which hacl been offered by another after the compromise; they rely also on the length of time which has elapsed.
The bill was dismissedVby the circuit court, on hearing, and Mills’ heirs appealed.
The bill, answers, exhibits, facts agreed, and facts proved, present the case thus:
The compromise complained of, was of a controversy upon conflicting patents issued from the land office; and of a controversy then in litigation in a suit in equity, pending between the parties to the compromise.
The hill alleges, as the foundation for impeaching the compromise, that the warrants upon which Edward Graham’s entry of 20,000, was made, had been withdrawn, and appropriated elsewhere by the assignees of those, warrants; secondly, the illegality of the record of the survey by the surveyor of Fayette, which survey had been executed by Waller, pretending to act as deputy of Thomas Marshall, who was dead long before the certificate of survey was returned to the office of Fayette; thirdly, the illegality of the patent founded on such a survey; fourthly, the knowledge of the facts on the part of the defendants, Lee and Graham, and the concealment of those facts from the ancestor of the complainants; fifthly, that the defendants Lee and Graham represented their claim to be good and valid.
Assignment of the warrant.
Survey, how executed, and certificate returned.
Word “withdrawn” written in the margin of th.e entry book, does not prove the entry withdrawn.
*95 The bill as drawn, is skilfully worded, so as to involve the defendants in a knowledge and concealment of the facts charged, and the inferences of law drawn in the bill from those facts. As to inferences of Jaw thus charged, it is sufficient to say that they are denied by the answers; and the defendants aver that they were advised by counsel learned in the law, that their claim was good and valid. In this place it is needless to inquire as to the.effect of such a charge, of legal inference from facts, they belong to the court, and will be noticed more properly in an after part of the subject. As to facts, therefore, upon which the legal inferences depend, and as charged in the bill, they are to be considered under two aspects; first, as they existed at the compromise; secondly, as to the knowledge and concealment of those facts by the defendants, from Mills, the ancestor.
As to the warrants, the complainants produce copies of six of the warrants for 2,000 acres each, part of those upon which Edward Graham’s entry was made, with copies of assignments with Graham’s name, in April 1785, and a survey, (on those warrants and another,) for 26,500, for Wilkinson and others, (assignees of those six warrants,) executed on the 10th June, 1785, by S. Morgan, deputy for Thomas Marshall, surveyor of Fayette.
The survey of Edward Graham, for 14,500, part of the entry of 20,000, was executed on the 30th September, 1784, by Waller, who then was a lawful deputy of Thomas Marshall, surveyor of Fayette county, in which the land then lay; this survey was returned to Fayette office in 1803, 4 or 5, and received and recorded by Richard Higgins, then the surveyor; Waller not being a deputy of Higgins, and the land not then being within the curtailed limits of Fayette.
There is no withdrawal of Graham’s warrant on the entry books of the surveyor; the marginal word “withdrawn,” being all that is found.
There is no evidence that Lee or Graham were informed of the assignments or pretended assign- *96 merits of the six warrants, part of the 20,000 acres of Edward Graham, at the time of the compromise: nor any evidence of any representations by Lee or Graham to Mills, to induce him to compromise, nor of any assertion of the validity of their claim, other than the allegation thereof by their bill in equity then pending against Mills; so far from it, Mills was induced to the compromise by calculations and representations made by his son, one of the present complainants, that the value of the improvements proposed to be paid, would buy land elsewhere, on which they could live comfortably, and if they defended the suit pending, and were unsuccessful in that defence, the costs would eat out his substance and ruin him, and brought to his view the consequences of a former unsuccessful law suit.
Inducements to the compromise.
The complainants, however, did know of the return of the survey to the office of Fayette, after the death or resignation of Thomas Marshall, and of the consequent progress in obtaining their patent; and there is no proof that these facts were disclosed to Mills.
That the entry of Graham, (if trot rendered null or vacated by the withdrawal of the warrants, or by the return of the survey to Fayette, after Higgins was surveyor, and Marshall out of office,) was not valid, special and precise, that this entry would not have otherwise been the superior claim to that of Mills, is not alleged. The destruction of the entry, survey and patent under which Lee and Graham held and founded their suit then pending, by reason of the assignment of the warrants; the manner of returning the survey and obtaining the patent, after such assignments and upon such process in the surveyor’s and register’s offices are relied on, as vacating the entry of Edward Graham, and the. patent of the then complainants Lee and Graham; provided Mills had then known of those defences; and the grievance complained of is, that the then complainants, now defendants Lee and Graham, did not disclose those facts before they made the comr promise.
Point relied on by the bill for rescission of the compromise contract.
Interference of adversary grants for land, is a sufficient consideration for a compromise, and if neither party superindu-ces the compromise by fraud or imposition, the contract shall not be rescinded.
To maintain the bill by Mills’ heirs, they propose now for adjudication, that the facts set forth in their bill about the assignment of the warrants, and the process of obtaining the patent upon Graham’s entry, of which they knew not then, would have been sutlicient, if disclosed to them by Lee and Mills, to haye enabled the ancestor, Mills, to defend and defeat the bill then pending; and secondly, that Lee and Graham were bound to disclose those facts if they knew them.
Lee and Graham had an entry, survey and patent, conflicting with the patent of Mills. They had asserted their claim in a court of justice, their patent was obtained according to the forms of law, and the entry is admitted to be special and precise, and the claim was apparently valid. Mills the ancestor had also a patent, derived according to the forms of law, but as the bill admits, and as the compromise admits, not to he maintained as the superior claim, but by showing something in destruction of the claim of Lee and Graham. Mills’ claim liad no positive merit; its force consisted in the date of the grant; the defence of Mills in the bill then pending, consisted in his ability to show something to destroy the claim of the complainants, for Graham’s entry was valid. The heirs say, their ancestor, of himself, knew not of the defences now set up, and compromised because Lee and Graham did not disclose these weaknesses and imperfections in their own claim.
Whether the facts relied upon in this bill, would have been sufficient to defeat the bill pending at the time of the compromise, is a question which this court néed not go into. The comparative merits and demerits of the two conflicting claims which were compromised, will not now be tried. Thy claims conflicted; they were sued out from the land office according to the forms of law; they were conflicting patents, actually located on the same land. This was enough to lay a good and equitable consideration and foundation for the compromise. If neither party superinduced the compromise by fraud or imposition, neither party can attack the compro *98 mise by shewing his claim was the superior in law or in equity.
Consideration and validity of compromises fairly -made.
Equity may rescind contracts of compromise, only for fraudulent representations or concealment of facts, or other unfairness.
In Conn vs. Conn, (1 Pr. Williams 726,) it was decided by Lord Macclesfield—“That where two parties are contending, and one releases his pretensions to the other, there can be no colour to set this release aside, because the man that made it had the right; for by the same reason there can be no such thing as compromising a suit, nor room for any accommodation; every release supposes the party making it to have aright; but this can be no reason for its being set aside, for then every release might be avoided.”
If the party releasing was ignorant of his own -fight, or if his right is concealed from him by the person to whom the release is made, there will 'be good reasons for the setting aside the release.
In Stapleton vs. Stapleton, (1 Atk. 10,) it was decided by Lord Hardwicke, “that an agreement entered into upon a supposition of a right or of a doubtful right, though it after comes out that the right was on the other side, shall he binding, and the right shall not prevail against the agreement of the parties, for the right must always be on the one side or the other, and therefore the compromise of a doubtful right is a sufficient foundation of an agreement.”
In Pullen vs. Ready &c. (2 Atk. 592,) the case of Conn vs. Conn, was again approved; and also in this court, in Taylor vs. Patrick, 1 Bibb 171; Fisher vs. May’s heirs, 2 Bibb 449; and in M’Intire vs. Johnson, 4 Bibb 49.
The compromise of a doubtful claim cannot be set aside, but for fraudulent misrepresentations of facts, or fraudulent concealment of facts or such imposition otherwise as amounts to unconscientious and unfair dealing.
We say fraudulent concealment of facts, because a concealinent of that which .the party was not bound to, disclose, would not be ground for avoiding a compromise. Suppose Lee and Graham had known *99 that these warrants had been assigned away after the survey of 1784 had been executed, and that other lands had been surveyed in 1785, and believed, as they state, that those assignments had been illegally and surreptitiously made, were they bound as suitors in court, upon a treaty of compromise, to have disclosed the facts to their adversary, to strengthen his defence in case no compromise was effected ? To say that they were, would be to lay down a rule too refined for the common sense and understandings of upright men. It would, in effect, prescribe to those in treaty for a compromise of doubtful conflicting claims, the duty to disclose the weaknesses, doubts and difficulties of their respective claims, and discourage all compromises.
One party in a land controversy is not bound to disclose to his adversary the' facts which constitute defects in his title. •
Merchants not bound to disclose their knowledge of facts which effect the market.
Pacts which the party to a compromise must disclose, and of what he is not bound ta speak.
Cicero, in his book de officiis, gives his opinion that a corn merchant arriving at Rhodes at a time of great scarcity, knowing that a large supply is on the way, ought for disclose the fact to the islanders, so important to them to know, and that he ought not, by concealment, get a much higher price for his own cargo; and he argues well as a moralist, in favor of that opinion. But what merchant ever acted upon’that pure system of ethics? Could a Court of equity set aside his sale, for want of such a disclosure? However devoutly it is to be wished, that mankind could be brought, in their contracts, to observe such a refined system of morality, yet if courts of equity were to act upon it, (as Judge Pendleton said in Jplliffe vs. Hite,) it would, in the present state of society, produce more evil than good.
Courts of equity will hold the one party or the other, responsible for the truth of the representations made in their communications relative to a contract, and if the fact be unfairly or untruly represented, whether innocently or designedly, the party to whom the representation is made, shall not be injured by it. So also, it holds a party contracting, to abstain from fraud or deceit by concealment of facts which, in fair dealing, the one party has a right to expect to be disclosed, and which the other party is bound to disclose. It may be diffi *100 cult at ail times, to discern the true line between that which a party may lawfully forbear to disclose, and that which hecannot withhold without incurring the guilt of fraud or deceit. The circumstances not disclosed, must always be compared with the object and end in view by the contracting parties. Ih the present case the end and aim of the parties, in contracting and compromising an existing suit, was to avoid the hazard and expense of litigation. No reasonable man ought to expectin such communication, that the one party and the other is bound to mutual disclosure of the means of attack and defence in case the compromise does not succeed. Such a rule would forbid all attempts at compromise.
O116 of the litigants in a controversy for land, claiming tinder the elder entry is not bound to disclose in a treaty of compromise, that it appeared the warrants had been withdrawn and assigned after the survey and before the grant.
In the present controversy the entry, tbe survey, the grant and the confiiction of that grant with Mills’ grant, all existed. The entry had not been withdrawn, the warrants for part only of Qiaham’s entry, 12,000, out of 20,000, had been assigned after the survey of 1784 was executed; these assignments were not made by Lee or Graham; but as they allege, illegally and without authority; were they bound, if they knew of those assignments done by others, to have disclosed them in a treaty, having in view tifo compromise of the pending litigation? Although spell a disclosure might have iiad some bearing in the treaty, by enhancing or diminishing the demands of the one party or the other, as to the terms of compromise, yet the authority, and legality, and consequence, of the fact of the assignment of the warrants so made, was itself a matter to be controverted. The assignments of the warrants, subsequent to the entry and survey of Graham, may be likened to the supply of corn on the way to Rhodes, in the ease before stated from Tally. A court of equity could not interfere to abrogate the contract made for the corn, because the failure to communicate the supply which was on the way, was an extraneous circumstance, which the seller was not bound to disclose, howsoever it might have influenced the purchaser if known. So the facts in. the bill, compared with the subject of the treaty and contract, were matters extraneous. They moreover *101 were not resting solely in the knowledge of Lee and Graham, but accessible to Mills upon inspection of the records and inquiry of the surveyor; they were matters which the defendants were not bound to disclose in a treaty and communication on the subject of compromise of the litigation. Was Mills bound to have disclosed facts behind his patent, survey and entry ^ or other defect in his claim, which would have rendered it worthless, and not enti-tlining him even to the benefit of claiming compensation for his improvements? Courts of equity do not discountenance compromises of doubtful claims, much less of suits actually instituted for litigating such claims. The rule contended for by the complainants would tend to discourage and defeat all compromises.
Interference between original adversary claims, a sufficient consideration for a compromise.
Force of compromises.
Without doubt it may be affirmed, that the actual interference which existed between the entry, survey and patent of Lee and Graham, with the patent of Mills, was such an existing claim, such a doubtful right, as to be a substratum and good consideration for the compromise, without intending to intimate any opinion as to the effect and legal consequences of the facts charged in the bill to invalidate the entry, survey and patent under which Lee and Graham claim, provided they had been insisted on by way of defence to the bill in equity, which was compromised; we think they furnish no ground for impeaching the compromise. It was free from fraud or imposition; and Mills having put himself on the safe side of the hedge by the compromise, and actually received the consideration, his heirs now come into court wishing to try whether the claim of Lee and Graham was invalid, and obtain ail the benefit of litigating that question, without danger of loss, if the facts amount to a destruction of Lee and Graham’s claim, then the heirs would have the land, and set aside the compromise; if not, they will yet hold the money received for the improvements and the title of Lee and Graham to the two tracts which they had sold out of their claim.
“The solemn agreements, release and conveyances made by the parties in the spirit of com *102 promise, are not slightly to be blown off and set aside.”
Wickliffe, for appellants; Crittenden, for appellees.
Decree affirmed, with costs.